UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


CIVIL ACTION NO. 11-10112-RWZ


ANGELA WOODS

v.

MICHAEL ASTRUE,
Commissioner, Social Security Administration


<u>MEMORANDUM OF DECISION</u>

June 13, 2012

ZOBEL, D.J.


Plaintiff Angela Woods files this appeal under 42 U.S.C. § 405(g) to reverse the decision of defendant, Social Security Commissioner Michael Astrue ("the Commissioner"), denying her claim for Disability Insurance Benefits ("DIB") because she is not disabled under the Social Security Act.  She claims that the Commissioner erred by giving limited weight to the opinions of some of her treatment providers, assessing certain limitations on her credibility, and failing to prove that she could perform specific jobs that exist in the national economy.  For the reasons explained below, the Commissioner's decision is affirmed.

**I.    Background**

Plaintiff is 41 years old.  She has at least a high school education and has attended some college.  She has a ten-year old daughter and lives with her mother and her sister in Quincy, Massachusetts.

She applied for DIB on November 5, 2008, for an alleged disability beginning on

October 23, 2008.  Her claimed disability is degenerative disc disease, chronic neck

and back pain causing numbness in her upper and lower extremities, pain in her right

ankle, and depression.  She formerly worked as a train operator and customer service

representative for the Massachusetts Bay Transportation Authority.  She has not

worked since her alleged onset date.

### A.    Applicable Statutes and Regulations

Under the Social Security Act, a claimant seeking DIB must prove that she is

unable to "engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death or

which has lasted or can be expected to last for a continuous period of not less than 12

months ["the duration requirement"][.]"  42 U.S.C. § 423(d)(1)(A).

The ALJ employs a five-step sequential evaluation process to assess a claim for

DIB. See 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 404.1509.  The evaluation may be

concluded at any step in the process if it is determined that the claimant is or is not

disabled.  20 C.F.R. § 404.1520(a)(4).  In order, the ALJ must determine: (1) whether

the claimant is engaging in substantial gainful work activity; if not, (2) whether the

claimant has a severe medical impairment that meets the duration requirement; if so,

(3) whether the impairment meets or equals an entry in the Listing of Impairments, 20

C.F.R. Pt. 404, Subpt. P, App. 1, and meets the duration requirement; if not, (4)

whether the claimant's residual functional capacity ("RFC") is sufficient to allow her to

perform her past relevant work; and, if not, (5) whether in light of the claimant's RFC,

age, education, and work experience, she can make an adjustment to other work. Id. § 404.1520(a)(4)(i)-(v)

A claimant's "impairment(s), and any related symptoms, such as pain, may cause physical and mental limitations that affect what [she] can do in a work setting." 20 C.F.R. § 404.1545(a)(1).  RFC is "the most [a claimant] can still do despite [her] limitations."  Id.  A claimant can adjust to other work if she can do any jobs that "exist in significant numbers in the national economy (either in the region where [she] live[s] or in several regions in the country)."  Id. § 404.1560(c)(1).

The claimant bears the burden of proof on steps one through four, id. § 404.1520; the Social Security Administration or state agency making the disability determination bears the burden of proof on step five.  Id. § 404.1560(c)(2). See also Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001).

## B.    Procedural History

Plaintiff's DIB application was denied initially and upon reconsideration.  She then requested an administrative hearing.  ALJ Constance D. Carter held a hearing on April 30, 2010, at which plaintiff was represented by attorney Alida S. Howard.  The only witnesses who testified were plaintiff and vocational expert Edmond J. Calandra.  On August 18, 2010, the ALJ decided that plaintiff was not disabled.  The Decision Review Board affirmed the decision on November 19, 2010.  Plaintiff filed this appeal on January 18, 2011.

## C.    Evidentiary Record

### 1.    Medical Record

### a.    Neck and Back Pain

Plaintiff has seen more than a half-dozen treatment providers for her neck and back pain. She started treating with orthopedic surgeon Tony Tannoury, M.D., in July 2008. In September 2008, after Dr. Tannoury reviewed MRI results of her cervical spine, which showed some "mild degenerative changes," Tr. 219, he recommended a treatment of physical therapy, but opined that surgery could be a reasonable option if her symptoms persisted. In November 2008, she received a second opinion about surgery from Andrew White, M.D. A physical exam at the time by physician's assistant Michael Schweid showed a normal gait, full range of motion of her cervical spine and full upper extremity strength, despite a mildly positive response to Hoffman's sign.[1] Dr. White ultimately referred plaintiff for a neurological examination to evaluate her disc degeneration, complaints of arm and leg weakness, and visual difficulties with her left eye.

Viken Babikian, M.D., conducted a neurological examination in December 2008. The exam "was within the broad limits of the normal range, save for symmetrically brisk reflexes at the knees, as well as perhaps some minimal give-way-type weakness of the left leg." Id. at 260. Dr. Babikian also identified some mild degeneration in the cervical

---

[1] "Hoffman's sign is a neurological sign in the hand which is an indicator of problems in the spinal cord. It is associated with a loss of grip. The test for Hoffman's sign involves tapping the nail on the third or forth finger. A positive Hoffman's is the involuntary flexing of the end of the thumb and index finger-normally, there should be no reflex response. Hoffman's sign is an indicator of a number of neurological conditions including cervical spondylitis, other forms of spinal cord compression, and multiple sclerosis." Krupa v. Barnhart, No. 05-CV-0670, 2006 WL 1517374, at *4 n.7 (E.D. Pa. May 31, 2006) (citing, inter alia, Dorland's Illus. Medical Dictionary 1699 (28th ed. 2004)).

spine.  Given plaintiff's chronic complaints of neck pain, he thought it was sensible to

consider surgery but did not strongly recommend it.  He also noted MRI evidence of

"mild lumbar spine disease" for which he recommended treatment with a medical, rather

than surgical approach.  Id. at 261.

Plaintiff received a second neurological evaluation on January 14, 2009, by

Efstathios Papavassiliou, M.D.  Dr. Papavassiliou found that plaintiff was negative for

Hoffman's sign, had full motor capabilities in her upper extremities, intact sensation,

and nearly full ability to finger and grasp with her left side.  He referred plaintiff to

Pushpa Narayanaswami, M.D., for consultation and an electromyography of her upper

extremities.

On February 3, 2009, Dr. Narayanaswami evaluated plaintiff for "cervical

[degenerative joint disease], bilateral upper extremity weakness and numbness, neck

pain, balance difficulty, and left eye problems."  Id. at 273-78.  Dr. Narayanaswami

opined that an MRI of plaintiff's lumbar spine was unremarkable, but that an MRI of her

cervical spine showed some degenerative disc disease.  Still, although Dr.

Narayanaswami found some cervical degeneration, she noted

> [plaintiff's] subjective symptoms in her upper extremities [are] rather
> vague and do not suggest clinical radiculopathy.[2]  I do not see evidence
> of radicular deficits either motor, sensory, or reflex.  She has mildly brisk
> reflexes that may indicate a mild degree of underlying myelopathy[3] but
> otherwise no features of an ongoing severe myelopathy.

Id. at 277.  Despite plaintiff's complaints related to numbness and tingling in her lower

---

[2] Disorder of the spinal nerve roots.  Stedman's Med. Dictionary 347610 (27th ed. 2000).

[3] Disorder of the spinal cord.  Stedman's, supra note 2, at 264850.

extremities and left eyelid twitching, Dr. Narayanaswami found that plaintiff's "exam is completely normal." Id. She further reported that "[a]lthough [plaintiff] complains of balance difficulties, her gait was actually quite normal. She had subjectively some difficulty in doing tandem but she is actually able to do it very well objectively." Id. Dr. Narayanaswami planned on reviewing plaintiff's brain MRI "to make sure this is not a central process with intermittent symptoms, such as a demyelinating illness" but noted that plaintiff's "clinical exam being normal argues against this." Id. at 277-78.

On March 16, 2009, plaintiff saw Dr. Narayanaswami for a follow-up visit. The doctor reported that plaintiff was "unable to give me a good history" of her arm weakness, and that plaintiff "has not had any episodes of leg numbness" save for a brief period when her leg was a "little stiff for a while and then got better." Id. at 368. Dr. Narayanaswami also noted that although plaintiff reported that her balance was "so so," she had not fallen. Id. at 367. A "careful neurological exam [did] not reveal any evidence of motor weakness or sensory deficits." Tr. 369. She determined that plaintiff had "cervical spondylosis,"[4] but noted that "[a]lthough she certainly has neck pain, pain in the arms and her complaints are not really clearly radicular. She has really no neurological deficits." Id. at 369.

Plaintiff began treating with Ritchie Lero, M.D., on July 28, 2009. On that day, he also filled out an RFC questionnaire for plaintiff's Social Security paperwork. Dr. Lero stated that plaintiff could walk only one block without rest or severe pain; could

---

[4] Stiffening or fixation of the cervical vertebrae, intervertebral discs, and surrounding soft tissue; often applied nonspecifically to any lesion of the spine of a degenerative nature. Stedman's, supra note 2, at 382100, 23900.

continuously sit and stand for 15 and 30 minutes at a time, respectively, and could sit and stand or walk for less than two hours total in an eight-hour workday.  He further noted that if plaintiff had a sedentary job, she would need to keep her legs elevated 80% of the time.  He assessed restrictions on plaintiff's ability to grasp, reach, and manipulate objects with her left hand and arm, as well as certain environmental restrictions, such as exposure to extreme cold, heat, and humidity.

Dr. Lero filled out a second RFC questionnaire on May 3, 2010, in which he found essentially the same limitations as he had articulated ten months earlier.  In the interim, plaintiff visited Dr. Lero almost every month and reported that her pain was under control with medication and that she could perform her daily activities. See id. 376-394.  Dr. Lero's RFC assessments and his treatment notes are discussed in more detail below.

As a result of Dr. Lero's referral, on March 12, 2010, Zacharia Isaac, M.D., evaluated plaintiff at the Brigham Arthritis Center for neck pain and hand stiffness.  A physical examination revealed that plaintiff was "in no acute distress." Id. at 372.  She had a normal gait, and her neurologic exam revealed full strength in her upper and lower extremities, full sensation, and a negative for Hoffman's sign.  Dr. Isaac determined plaintiff had "[c]hronic neck pain that has been unchanged," but noted that a clinical exam revealed "no concerning signs or symptoms" with regard to her neck pain, and that she reported "that her [neck pain] symptoms have been stable for the last few years." Id.  For her neck pain, Dr. Isaac recommended a conservative treatment of physical therapy and chiropractic manipulations, which plaintiff reported were helping.

While plaintiff also complained of recent hand stiffness, she did "not report any joint swelling, warmth, or redness." Id. at 371.  Instead, she reported that she was fine during the day after loosening her fingers by stretching or running them under warm water, and was able to use her hands with no weakness or clumsiness.

On April 27, 2010, Dawn A. Fraser, N.P., conducted an in-office exam of plaintiff at the Neponset Health Center.  A physical exam revealed she was in "no apparent distress," and a musculoskeletal exam revealed "no skeletal tenderness or joint deformity." Id. at 374.

Albert J. Popp, M.D., conducted a neurosurgical consultation of plaintiff on July 19, 2010.  A sensory exam showed no abnormalities in her upper and lower extremities; her muscle tone and strength in these extremities was "entirely normal," and her station and gait were normal. Id. at 429.  Dr. Popp found that plaintiff did have "bilateral paravertebral muscle spasm and some muscle spasm in the lower back region," and "range of motion in the neck is restricted." Id.  He conducted a follow-up evaluation on August 30, 2010, at which plaintiff complained of "some pain in her neck and lower back and also note[d] some tingling in her arms." Id. at 427. A physical exam "show[ed] a good range of motion of her neck." Id.  Save for some weakness in the shoulder area and sensitivity brought on by compression of her ulnar nerve, her strength was normal and her sensation intact.  Dr. Popp opined that plaintiff's problem did not require surgery, but rather more conservative treatment such as physical therapy and injections.

### b.    Ankle Pain

Plaintiff treated with Naveen Duggal, M.D., for right ankle pain in late 2008 and early 2009.  Dr. Duggal's records reflect that although plaintiff has some lingering tenderness on her ankle from a previous injury and subsequent surgery, her surgical scars were well-healed, MRI and x-ray results were normal, and plaintiff appeared to have a full range of motion and stability in the ankle.  Dr. Duggal recommended using a heel cup for stability for certain activities.

### c.     Depression

Plaintiff treated for her depressive symptoms at the Neponset Health Center with Courtney Pardue, LICSW, and Carrie Galhouse, R.N.  Ms. Pardue first examined plaintiff in December 2008.  On February 24, 2009, Ms. Pardue filled out a Psychiatric Disorder Form, on which her descriptions were largely a reflection of plaintiff's self-reported symptoms. See e.g., id. at 288 ("[Patient] reports more isolated and difficulty motivating herself to attend daily responsibilities"; "concentration poor - patient reports more difficulty performing tasks, low motivation"; "concentration poor - trigger is physical pain"; "patient reports memory is poor and she is needing to write down appointments in order to remember"); id. at 289 ("[patient] notes she is more irritable and isolating more").  Her prognosis was "unclear." Id. at 290.  She noted that plaintiff had "responded well to medication" and that "[t]his is first depressive episode in context of medical condition." Id.  Ms. Pardue also completed a mental RFC questionnaire on April 16, 2009, which is discussed in more detail below.

On February 23, 2009, Ms. Galhouse completed a Psychiatric Disorder Form and diagnosed plaintiff with "major depression, single episode. " Id. at 284.  Ms.

Galhouse's treatment notes and assessments are also discussed below.

### 2.    State Consultants

Marcia Lipski, M.D., reviewed plaintiff's medical records and conducted a

physical RFC assessment on January 26, 2009.  She concluded that plaintiff could

occasionally lift up to 10 pounds, and during an eight-hour workday with normal breaks,

could stand and/or walk for at least two hours and sit for about six hours.   She found

plaintiff's allegations "partially credible," id. at 265, noting that although plaintiff's MRI

results showed cervical and lumbar degeneration, she had a full range of motion in her

cervical spine, and full strength and intact reflexes in her upper extremities.  Id. at 263-

65. Dr. Lipski also noted plaintiff's ability to "perform rapid movements," prepare meals,

take her daughter to school, drive, and shop for groceries. Tr. 265.

On March 10, 2009, M.A. Gopal, M.D., conducted a physical RFC assessment

after reviewing plaintiff's records.  Because the MRI of plaintiff's cervical spine showed

"disc herniation with abutment of spinal cord and myelomalacia" and "degenerative disc

disease," Dr. Gopal limited the frequency with which plaintiff could lift certain weights,

and found that during an eight-hour workday with normal breaks, plaintiff could stand

and/or walk for six hours and sit for the same.  Id. at 307.  Dr. Gopal found no postural,

manipulative, visual, communicative or environmental limitations, and noted that on a

recent physical examination, plaintiff lacked motor or sensory deficits and her gait was

normal.  Finally, Dr. Gopal determined that plaintiff's allegations were partially credible

and that she could do "light RFC work." Id.

Michael Maliszewski, Ph.D., reviewed plaintiff's records and conducted a mental

RFC assessment on March 26, 2009.  He determined that plaintiff had the recall and attention to perform simple tasks.  While he opined that she would perform better in more independent job roles, he also found that her "mood would not prevent her from performing concrete tasks in a supportive work setting." Id. at 330.  Among other things, he found plaintiff was not significantly limited in her ability to remember locations and work-like procedures; understand, remember, and carry out very short and simple instructions; make simple work-related decisions; and ask simple questions or request assistance.[5]   She was moderately limited in her ability to respond appropriately to changes in the work setting; interact appropriately with the general public; complete a normal work day and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; perform activities within a schedule, maintain regular attendance and be punctual with customary tolerances; maintain attention and concentration for extended periods; and understand, remember, and carry out detailed instructions.  Id. at 328-29.  He assigned her a global assessment of functioning ("GAF") of 55, id. 330, which indicates a moderate difficulty in social, occupational, or school functioning.  Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000).

### 3.    Plaintiff's Reports and Testimony

In her Social Security paperwork and testimony, plaintiff described her daily

---

[5]  The mental RFC assessment form permitted Dr. Maliszewski to rank or assign a degree of limitation for each mental activity.  The possible rankings were: (1) Not Significantly Limited; (2) Moderately Limited; (3) Markedly Limited; (4) No Evidence of Limitation in this Category; and (5) Not Ratable on Available Evidence. See Tr. 328.

activities and subjective symptoms, including the extent of her pain.  She complains of pain in her neck that goes down her arm, and keeps her from sleeping.  Also, she claims that she can only stand or sit for short periods, experiences numbness on her left side, tingling and sharp pains going down her arms, and pain in her right ankle. She testified that she can walk no more than a block, and that after standing for 30-45 minutes she feels "numbness and weakness and pins and needles." Tr. 43. When she walks, she feels that her legs become unsteady and clumsy, so she will sit down because she is afraid of falling; however, she does not sit for long because she claims to be in pain when she sits.  Further, she testified that she cannot stand on her ankle for more than 15-25 minutes because it begins to swell.  Percocet relieves her pain and she feels better with her legs elevated.

Since the onset of her disability, plaintiff mostly stays at home, does not do housework or socialize, and usually leaves the house only to attend medical appointments, although she does go grocery shopping with her mother.  When she leaves the house, she either gets rides from her family or drives herself.  Her sister and her mother help her take care of her daughter.

If she does not have a medical appointment to attend, she lays around all day because she is in pain.  She testified that she spends at least three to four hours a day laying down, and reports rarely reading or watching TV, except with her daughter.  She is able to lift a gallon of milk, but is afraid to lift babies for fear of dropping them. She also reports difficulty dressing herself and showering, and claims that she no longer cooks because she has lost interest in doing so and her arms start to hurt if she stands

for too long.  Where once she was bubbly and people-oriented, she now avoids people.

She claims that she can only pay attention for ten minutes and does not do anything

that requires her to follow written or spoken instructions.  She also reports not handling

stress well.  To treat her depression, plaintiff visits with her therapist twice per week

and goes to group therapy once per week.

### D.    ALJ's Decision

Plaintiff does not quarrel with the ALJ's analysis and decision concerning steps

one through three.  Thus, it is established that plaintiff has not engaged in substantial

gainful activity since October 23, 2008, her alleged onset date, and that she has severe

impairments – cervical disc disease and depression – but that those impairments do

not meet or equal one of those on the Listing of Impairments.  Id. at 9-11.

The ALJ made the following RFC assessment:

> After careful consideration of the entire record, the undersigned finds that
> the claimant has the residual functional capacity to perform sedentary work
> as defined in 20 CFR 404.1567(a) with limitations to simple routine repetitive
> tasks not performed in a fast paced production environment which involve
> only simple work related decisions and in general relatively few work place
> changes.

Id. at 13.  After she evaluated plaintiff's hearing testimony, the ALJ explained

that while plaintiff's medically determinable impairments could reasonably be

expected to cause the alleged symptoms, her statements concerning the

intensity, persistence, and limiting effects of those symptoms were not credible

insofar as the objective medical record established that such statements were

inconsistent with the RFC assessment.  In particular, the ALJ cited physical

examinations which showed no strength or sensory deficits, muscle atrophy or

13

joint abnormalities, a normal range of motion in the extremities and lumbar spine, and normal gait and coordination. She also noted that plaintiff "has been treated with conservative measures and pain medication but is not a surgical candidate." Id. at 14.

The ALJ gave "limited weight" to Dr. Lero's opinion because his RFC assessments in July 2009 and May 2010 were inconsistent with the record evidence as a whole and with his own treatment records. Id. Instead, she found that Dr. Lero's assessments were merely a "recitation of the claimant's subjective complaints, not limitations established by objective signs, symptoms and findings." Id. She further noted plaintiff's repeated follow-up visits to Dr. Lero, beginning in August 2009, at which plaintiff received a normal physical and neurological exam and reported that her condition was well controlled and that she was able to perform her daily activities while on medication. Tr. 14. By contrast, the ALJ gave significant weight to Dr. Zacharia Isaac's report because "it contains specific physical findings and is consistent with the medical evidence of record." Id.

At step four, the ALJ concluded that plaintiff was unable to perform her past relevant work as a train operator or customer service representative. However, relying on testimony from vocational expert Calandra, she found at step five that plaintiff's age, education, work experience, and RFC qualified her to do other jobs that existed in significant numbers in the national economy; namely, security surveillance system monitor, credit card order clerk, and

14

election clerk.  She therefore decided that plaintiff was not disabled under the

Social Security Act and denied plaintiff's application for benefits.

## II.      Standard of Review

The Commissioner's findings of fact are conclusive if they are supported by

substantial evidence and based on the correct legal standard.  42 U.S.C. § 405(g);

Seavey, 276 F.3d at 9.  "[T]he responsibility for weighing conflicting evidence, where

reasonable minds could differ as to the outcome, falls on the Commissioner and his

designee, the ALJ." Seavey, 276 F.3d at 10.  See also Rodriguez v. Sec'y of Health

and Human Servs., 647 F.2d 218, 222 (1st Cir. 1981) (the Commissioner has "prime

responsibility" for determining "issues of credibility and the drawing of permissible

inference from evidentiary facts").  The court must accept the Commissioner's findings

if "a reasonable mind, reviewing the evidence in the record as a whole, could accept it

as adequate to support his conclusion." Rodriguez, 647 F.2d at 222.  The court must

uphold the Commissioner's determination "even if the record arguably could justify a

different conclusion, so long as it is supported by substantial evidence." Rodriguez

Pagan v. Sec'y of Health and Human Servs., 819 F.2d 1, 3 (1st Cir. 1987).  "While

'substantial evidence' is 'more than a scintilla,' it certainly does not approach the

preponderance-of-the-evidence standard normally found in civil cases." Bath Iron

Works Corp. v. U.S. Dep't of Labor, 336 F.3d 51, 56 (1st Cir. 2003) (reviewing an

appeal from a denial of workers' compensation benefits) (quoting Sprague v. Dir.,

Office of Workers' Comp. Programs, U.S. Dep't of Labor, 688 F.2d 862, 865-66 (1st Cir.

1982)).

### III.     Analysis

Plaintiff raises three issues on appeal.  First, she argues that the ALJ should have given greater weight to Dr. Lero's opinion and failed to properly consider the opinions of Ms. Pardue and Ms. Galhouse.  Second, she contests the ALJ's limitation of her credibility.  Finally, she contends that the ALJ failed to resolve an alleged inconsistency between the vocational expert's testimony and the Department of Labor's Dictionary of Occupational Titles ("DOT"), and thus failed to meet the Commissioner's burden at step five.

### A.     Weight Assigned to Opinions of Plaintiff's Treatment Providers

#### 1.     Dr. Lero

Plaintiff claims that the ALJ failed as a matter of law to explain her reasons for affording limited weight to Dr. Lero's opinion. See Pl. Br. at 14 (citing SSR 96-2p which states that the ALJ's decision "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicators gave to the treating source's medical opinion and the reasons for that weight").

The ALJ cited two reasons for discrediting Dr. Lero's opinion: (1) its inconsistency with the medical record as a whole, and (2) its inconsistency with Dr. Lero's own treatment notes. Tr. 14.  She further explained both, noting that Dr. Lero's own treatment notes from August 2009 to May 2010 undermined the RFC limitations he assessed, and that, in light of those treatment notes, his RFC assessments appeared to be recitations of plaintiff's subjective complaints. Id.  The ALJ discussed objective findings from the medical record when she explained why she gave plaintiff's testimony

16

limited credibility; namely, that physical exams and other objective medical evidence –
including plaintiff's own statements to Dr. Lero – did not establish the disabling level of
physical limitation which plaintiff claimed to have. Id.  The record bears this out.[6]  For
the same reason, the medical records contradict and undermine Dr. Lero's opinion of
plaintiff's limitations in his two RFC assessments.

Furthermore, the ALJ noted, and the record establishes, that Dr. Lero neither
provided any rationale nor referenced any objective findings to support the limitations
he described in either RFC questionnaire. Id. at 10-11 (noting that Dr. Lero established
care of plaintiff on the day he completed the RFC form and that he "did not provide any
rationale for these limitations such as a physical exam findings and did not report
prescribed treatment"); id. at 11 (explaining that Dr. Lero "failed to note any objective
findings to support his conclusions" in his May 2010 RFC assessment).  In fact, at the

---

[6] See, e.g., Tr. 394-95 (visit with Dr. Lero, 8/3/2009: "Patient states [neck] pain is better
controlled now.  She denies weakness or numbness."; a physical exam revealed no sensory loss, no
motor weakness, and balance and gait intact);
    id. at 392 (visit of 8/20/2009: "Patient states she has been doing well and denies any severe
anxiety attack.  Pain is well control[l]ed and patient is able [to] do daily chores with no significant pain.");
    id. at 390 (visit of 9/24/2009: "Patient with chronic back pain comes in for medication refill.
Patient states her pain is relatively well controlled with Percocet. . . . She currently has no other
subjective complaints.");
    id. at 387 (visit of 10/22/2009 for medication refill of Percocet and ibuprofen for chronic back
pain: "She states pain is well controlled with current regimen.");
    id. at 385-86 (visit of 11/23/2009: "She states pain is well controlled with current medication
regimen but recently she may have overstrained hersel[f] and [is] currently experiencing some worsening
of pain."; musculoskeletal system review was "negative for bone/joint symptoms and weakness" and
physical exam showed revealed "extremities appear normal");
    id. at 382 (visit of 12/17/2009 for a medication refill.  "At the visit she state[d] she is doing well
and state[d] pain is well controlled and able to do activity relatively well.");
    id. at 380 (visit of 1/07/2010 for refill of Percocet:  "Patient states pain is relatively well controlled
and currently has no other complaints.");
    id. at 378 (visit of 2/11/2010: "Patient has chronic back pain . . . . Patient states pain currently
well controlled with current regimen.");
    id. at 376-77 (evaluation of 3/13/2010: "Patient is doing well currently and has no complaints";
her lower back pain was assessed as "currently stable").

hearing on April 30, 2010, the ALJ told plaintiff's counsel, Attorney Howard, that Dr.

Lero's treatment notes describing plaintiff's condition "don't seem to be in keeping with

his initial RFC [of July 28, 2009]." Id. at 50. The ALJ requested that plaintiff supplement

the record with a current RFC from Dr. Lero and cautioned Attorney Howard that if the

updated RFC was "not tied into [Dr. Lero's] treatment records," she would not give it as

much credibility as she would if it were. Id.  As noted above, Dr. Lero's updated RFC of

May 3, 2010, was virtually identical to his original RFC assessment.

### 2.    Ms. Pardue and Ms. Galhouse

The ALJ found that medical treatment records regarding plaintiff's depression

also supported her RFC assessment.  Id. at 14. Ms. Pardue and Ms. Galhouse primarily

treated plaintiff for depression.  Plaintiff argues that the ALJ erred by failing to properly

weigh their opinions.

The ALJ discussed Ms. Pardue's assessment of plaintiff in some detail in the

context of assessing severe impairments at step two. See id. at 10.  Neither Ms. Pardue

nor Ms. Galhouse diagnosed any limitations more severe than those found by the ALJ.

In fact, in February 2009, Ms. Galhouse determined that plaintiff had no deficits that

would interfere with timely task completion or regular routine; could "sustain

concentration and attention . . . for extended periods without distraction by

psychologically based symptoms or external stimuli"; and could remember work-like

tasks and instructions.  Id. at 284. While she described plaintiff's irritability and desire

to be left alone, she also noted that plaintiff was "appropriate and pleasant" during the

appointment, as well as "cognitively intact" and "easily engaged."  Id. at 285.  One

month earlier, she found plaintiff to have an intact memory, cooperative attitude, and good reasoning, impulse control, judgment, and insight. Id. at 299.

In her April 2009 assessment, Ms. Pardue similarly found that plaintiff had the "limited, but satisfactory" mental ability and aptitude to understand, remember, and carry out very short and simple instructions; maintain attention for two-hour segments; make simple work-related decisions; complete a normal workday and workweek without interruptions from psychologically based symptoms; respond appropriately to changes in a routine work setting; and deal with normal work stress. Id. at 339. She concluded that plaintiff was "seriously limited, but not precluded" from maintaining regular attendance and being punctual within customary, usually strict tolerances, and performing at a consistent pace without an unreasonable number and length of rest periods. Id. (emphasis added).

Since neither Ms. Pardue nor Ms. Galhouse found any limitation in excess of those found by the ALJ, the ALJ's failure to specifically discuss the weight assigned to each of their opinions did not prejudice the plaintiff and was not reversible error. Caldwell v. Barnhart, 261 F.Appx. 188, 190 (11th Cir. 2008) (ALJ's failure to specifically state weight accorded to an opinion "only constitutes reversible error if it created an evidentiary gap that caused unfairness or clear prejudice").

### B.    Limitations on Plaintiff's Credibility

Plaintiff next argues that the ALJ failed to fairly and accurately credit her subjective complaints, especially those of pain. She contends that the ALJ did not follow the procedure set forth in Avery v. Sec'y of Health and Human Servs., 797 F.2d

19, 28-29 (1st Cir. 1986), 20 C.F.R. § 404.1529, and SSR 96-7.

Although the ALJ did not explicitly mention <u>Avery</u>, she explored all six of the <u>Avery</u> factors in her decision.[7]  <u>See</u> Tr. 10-11, 13-14.  She then explained why the objective medical evidence – including plaintiff's own statements to her medical providers – undermined plaintiff's credibility on the extent and duration of her pain and its limiting nature. <u>See id.</u> at 14 (discussing physical exam findings and plaintiff's reported ability to perform daily activities with pain well-controlled on medication) and discussion of Dr. Lero's medical records, <u>supra</u>, Part III.A.1.  Based on the entirety of the record evidence, the ALJ could reasonably find that plaintiff's complaints of pain were less severe than alleged, and appropriately judged plaintiff's credibility as to her subjective symptoms.

### C.    Step Five Evaluation

At the administrative hearing, the ALJ posed a hypothetical to Vocational Expert ("VE") Calandra which mirrored the ALJ's ultimate RFC finding.  <u>See</u> Tr. 55.[7]   In response, Mr. Calandra testified that such a hypothetical individual could perform the jobs of security surveillance system monitor, credit card order clerk, and election clerk.

---

[7] The so-called <u>Avery</u> factors are the nature, location, onset, duration, frequency, radiation, and intensity of any reported pain; precipitating and aggravating factors (e.g., movement, activity, environmental conditions); type, dosage, effectiveness, and adverse side-effects of any pain medication; treatment, other than medication, for relief of pain; functional restrictions; and the claimant's daily activities.  797 F.2d at 28-29.

[7] The ALJ posed the following hypothetical to Mr. Calandra: "[A]ssume a hypothetical individual with the claimant's education, training, and work experience who is limited to a sedentary range of work as that term is defined under the regulations and is further limited to simple, routine, repetitive tasks which are not performed in a fast paced production environment involving only simple work related decisions and generally few work place changes.  Are there jobs in the national and local economy that a person with those limitations could perform?"

Plaintiff contends that Mr. Calandra's testimony is inconsistent with the <u>DOT</u> because the <u>DOT</u> assigns each of these jobs a reasoning ability of level three, defined as the ability to "[a]pply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form" and "[d]eal with problems involving several concrete variables in or from standardized situations." <u>DOT</u>, 1991 WL 688702.  She argues that the job descriptions in the <u>DOT</u> require a higher reasoning capacity than allowed by the ALJ's RFC.  Plaintiff further contends that by failing to address this alleged inconsistency, the ALJ did not meet her burden at step five.  <u>See</u> SSR 00-4p, 2000 WL 1898704 (S.S.A.) (requiring an ALJ to obtain a reasonable explanation for any conflicts between VE evidence and information in the <u>DOT</u> before the ALJ may rely on VE evidence to support a disability determination); <u>id.</u> at *4 (requiring an ALJ to explain in the decision how he or she resolved the conflict between the evidence provided by the VE and the information in the <u>DOT</u>).

Plaintiff fails to establish that her RFC is incompatible with jobs requiring a <u>DOT</u> reasoning level of three.  Regardless, she has waived the ability to raise the issue on appeal because she failed to raise it at the administrative hearing.  <u>See</u> <u>Mills v. Apfel</u>, 244 F.3d 1, 8 (1st Cir. 2001) (affirming lower courts' holding that claimant waived objection by failing to raise it before the ALJ; noting, "The impact of a no-waiver approach . . . at the ALJ level . . . could cause havoc, severely undermining the administrative process.").

## IV.    Conclusion

Plaintiff's Motion for Order Reversing the Decision of the Commissioner (Docket

# 17) is DENIED.  Defendant's Motion to Affirm the Commissioner's Decision (Docket # 19) is ALLOWED.  Judgment may be entered accordingly.


      June 13, 2012                        /s/Rya W. Zobel

          DATE                             RYA W. ZOBEL

                                  UNITED STATES DISTRICT JUDGE